IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Jacob Holmes (K-84657), | ) |
| Plaintiff, | ) |
| v. | ) Case No. 16 C 5234 |
| | ) Judge Amy J. St. Eve |
| Tracy Engleson, | ) |
| Defendant. | ) |

# MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

In this *pro se* action pursuant to 42 U.S.C. § 1983, Plaintiff Jacob Holmes, an Illinois prisoner, brought this challenge to the forcible removal of his dreadlocked hair and beard on the orders of Defendant Tracy Engleson, Stateville Correctional Center's former Superintendent, as a violation of his First Amendment right to free religious exercise. The Illinois Department of Corrections ("IDOC") has since related Holmes, a Rastafarian, to another prison. Before the Court is Defendant's motion for summary judgment. For the reasons set forth below, the motion is granted.

## NORTHERN DISTRICT OF ILLINOIS LOCAL RULE 56.1

Local Rule 56.1 sets out a procedure for presenting facts pertinent to a party's request for summary judgment pursuant to Fed. R. Civ. P. 56. Specifically, Local Rule 56.1(a)(3) requires the moving party to submit "a statement of material facts as to which the moving party contends there is no genuine issue and that entitle the moving party to judgment as a matter of law." *Petty v. City of Chicago*, 754 F.3d 416, 420 (7th Cir. 2014). Each paragraph of the movant's statement of facts must include "specific references to the affidavits, parts of the record, and other supporting materials relied

upon to support the facts set forth in that paragraph." L.R. 56.1(a). The opposing party must file a response to each numbered paragraph in the moving party's statement, "including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon." L.R. 56.1(b)(3)(B). "All material facts set forth in the statement required of the moving party will be deemed to be admitted unless controverted by the statement of the opposing party." L.R. 56.1(b)(3)(C). The nonmoving party may also present a separate statement of additional facts "consisting of short numbered paragraphs, of any additional facts that require the denial of summary judgment, including references to the affidavits, parts of the record, and other supporting materials relied upon." *Id*.

A district court may "decide [a motion for summary judgment] based on the factual record outlined in the [Local Rule 56.1] statements." *Markham v. White,* 172 F.3d 486, 490 (7th Cir. 1999); *see also Olivet Baptist Church v. Church Mut. Ins. Co.*, 672 Fed. Appx. 607, 607 (7th Cir. 2017) ("The district court treated most of the [defendant's] factual submissions as unopposed, because the [plaintiff] failed to contest them in the form required by Local Rule 56.1(b). We have held that the district court is entitled to enforce that rule in precisely the way it enforced the rule in this litigation.") (citations omitted); *Stevo v. Frasor*, 662 F.3d 880, 886-87 (7th Cir. 2011) ("Because of the high volume of summary judgment motions and the benefits of clear presentation of relevant evidence and law, we have repeatedly held that district judges are entitled to insist on strict compliance with local rules designed to promote the clarity of summary judgment filings."). Holmes's status as a *pro se* litigant does not excuse him from complying with Local Rule 56.1. *See McNeil v. United States*, 508 U.S. 106, 113 (1993) ("[W]e have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel."); *Coleman v.*

2

*Goodwill Indus. of Se. Wis., Inc.*, 423 Fed. Appx. 642, 643 (7th Cir. 2011) ("Though courts are solicitous of pro se litigants, they may nonetheless require strict compliance with local rules."); *Cady v. Sheahan*, 467 F.3d 1057, 1061 (7th Cir. 2006) ("[E]ven *pro se* litigants must follow rules of civil procedure.").

Because Holmes is proceeding *pro se*, Defendant served him with a "Notice to Pro Se Litigant Opposing Motion for Summary Judgment" as required by Local Rule 56.2. (Dkt. 32.) The notice explained how to respond to Defendant's summary judgment motion and Rule 56.1 Statement and cautioned Holmes that the Court would deem Defendant's factual contentions admitted if he failed to follow the procedures delineated in Local Rule 56.1. (*Id.* at 1-3.) Holmes responded to Defendant's Statement of Facts, admitting the facts contained within paragraphs 1, 3-6, 19, 21, and 25-27; he does not dispute the facts in paragraphs 2 and 17. (Dkt. 35, Plaintiff's Response to Defendant's Statement of Facts.) As these facts are supported by the cited materials, they are accepted as true.

Although Holmes purports to deny, at least in part, the remainder of Defendant's provided facts, the Court does not discern genuine disagreements as to the key facts. Holmes's objections fall into three categories. First, invoking his "Rasta[farian] Oath and (or) vow" and citing to the complaint and video camera footage that does not appear in the record, Holmes denies Defendant's recitation of the facts regarding how and when (1) he was ordered to comply with the correctional grooming policy and (2) his hair and beard were removed. (Dkt. 35 ¶¶ 12-16.) But merely characterizing a fact as disputed does not make it so. *Cardoso v. Cellco P'ship*, No. 13 C 2696, 2014 WL 6705282, at *1 (N.D. Ill. Nov. 26, 2014). Despite Holmes's denial, no factual disagreement exist as to these paragraphs, and therefore, the Court treats the included facts, which are supported by the cited

material, as true (subject to Holmes's legal objection that the cutting of his hair violated his rights). *See id.* ("The court will . . . disregard so-called denials of facts that are actually undisputed.").

Second, based on his position that dreadlocks in general—and his in particular—did not pose a security risk, and that it was unnecessary to transfer him to another prison, Holmes purports to deny Defendant's summarization of her duties, her method of assessing a grooming security risk, and direct quotes from the Illinois Administrative Code. (*Id.* ¶¶ 7-11, 20.) Because Holmes's objections do not challenge the specific facts set forth in the challenged paragraphs but simply raise legal arguments and additional facts, the Court accepts the challenged facts as true. *See Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 382 n.2 (7th Cir. 2008) (explaining that legal conclusions do not create disputed issues of fact); *see also Almy v. Kickert Sch. Bus Line, Inc.*, No. 08-cv-2902, 2013 WL 80367, at *2 (N.D. Ill. Jan. 7, 2013) ("[C]ourts are not required to 'wade through improper denials and legal arguments in search of a genuinely disputed fact.'") (quoting *Bordelon v. Chi. Sch. Reform Bd. of Trs.*, 233 F.3d 524, 529 (7th Cir. 2000)). The Court will address Holmes's additional factual assertions below.

Third, Holmes objects that multiple statements of facts, which quote directly from his deposition, were incorrectly transcribed by the court reporter. (*Id.* ¶¶ 18, 22-24.) He does not, however, contend that Defendant misquoted the transcript or explain what he purports to have actually said or why a corrected transcript would alter the result as to any material facts. Again, lacking specific factual disagreements as to the stated facts, the Court accepts these facts as true. *Cardoso*, 2014 WL 6705282 (disregarding "unresponsive" fact denials).

As to the facts Holmes seeks to add to the record to defeat Defendant's motions, *see* L.R. 56.1(b)(3)(C), he has not followed the local rule in two ways. First, he improperly inserted additional

facts into his responses to Defendant's local Rule 56.1(a)(3) statement. (*See, e.g.*, Dkt. 35 ¶¶ 8-11.) Second, he submits additional facts through his legal brief. (Dkt. 34.) *See Beard v. Don McCue Chevrolet, Inc.*, No. 09 C 4218, 2012 WL 2930121, at *5 (N.D. Ill. July 18, 2012) (stating that "facts submitted in a brief but not presented in a Local Rule 56.1 statement are disregarded in resolving a summary judgment motion") (citation and quotation marks omitted).

Because Holmes is *pro se,* the Court will be lenient as to his minor rule infractions. The Court has accepted Defendant's statements of fact, where supported by the cited evidentiary material, as true. Where Holmes has properly pointed to opposing facts or exhibits in the record that suggest a factual dispute, the Court will include those facts. The Court also will, in general, incorporate Holmes's factual assertions to the extent they are relevant and are such that Holmes properly could testify as to them at trial. The Court will not, however, dig through the summary judgment record to identify disputed issues of fact or find evidentiary support for any asserted disputes. *See Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 898 (7th Cir. 2003) ("We have repeatedly assured the district courts that they are not required to scour every inch of the record for evidence that is potentially relevant to the summary judgment motion before them" due to amount of material typically generated through discovery process).

## FACTS

Plaintiff Jacob Holmes is an Illinois prisoner currently housed at the Pontiac Correctional Center. (Defendant's Local 56.1 Statement of Undisputed Facts in Support of Her Motion for Summary Judgment (Def. SOF), Dkt. 28 ¶ 1.) In 2015, when all relevant events occurred, Holmes was housed in the Northern Reception and Classification Center (NRC), where Defendant Tracy Engleson was Superintendent. (*Id.* ¶¶ 1-2.) Defendant's duties included supervising the transfer of

inmates from the NRC to their "parent" correctional facilities and ensuring that such transfers complied with applicable rules, policies and procedures. (*Id.* ¶ 7.) As part of her role related to the supervision of prison transfers, Defendant also ensured the safety and security of those transfers, which necessarily involved inmates leaving the "fully secure areas of the prison." (*Id.* ¶¶ 7, 10.)

An Illinois Administrative Code provision and Individual Grooming Policy applied during the relevant time period. In relevant part, Title 20, Part 502 Section 502.110(a) of the Illinois Administrative Code provided that "[c]ommitted persons may have any length of hair, sideburns, mustaches, or beards so long as they are kept neat and clean and do not create a security risk." (*Id.* ¶ 8.) The Individual Grooming Policy provided that an inmate's hairstyle was deemed to pose a security risk if it "impede[d] or prevent[ed] staff from conducting a thorough search of the hair for contraband," or if contraband concealed in the hair "may not be detected" or "may injure staff attempting to search the hair." (*Id.* ¶ 9.)

Days after he was released from custody on parole, Holmes was re-admitted to the NRC on June 23, 2015, due to a parole violation, (*id.* ¶ 5), that Holmes says happened because he lost his host site. (Pl. Resp. Def. SOF ¶ 10.) Holmes testified that, for about five years, he had been cultivating his hair in dreadlocks, which were approximately two feet long on his head and eighteen inches long in his beard.[1] (Def. SOF ¶ 19.) Holmes maintained the dreadlocks because he is a Rastafarian, which, to him, is "more than a religion" but "a way of life." (*Id.* ¶¶ 22, 23.) As part of his Rastafarian lifestyle, Plaintiff participates in "a thing called a Cypher . . . where we interpret the Old Testament." (*Id.* ¶ 25.) His dreadlocks are his "expression," and he believes that hair should be cut "only in mourning

---

[1] Holmes denies using any "bonding" or "sealing" agent, such as honey or beeswax to form the dreadlocks, and insists that he achieved his dreadlocks "from letting [his hair] mend naturally." (Def. SOF ¶ 18; Pl. Resp. Def. SOF ¶ 18; Dkt. 34 ¶ 3.)

6

or in time of death. . . we take a vow of Nazirite, only time you'll cut it in my opinion is if you get like foul stuff in your hair." (*Id*. ¶ 26.)

On or about July 15, 2015, Defendant prevented Holmes from boarding a bus to transfer to Pontiac Correctional Center, informing him that his dreadlocked hair and beard posed a security risk. (*Id*. ¶¶ 6, 11.) She provided Holmes with a copy of the Individual Grooming Policy and ordered him to bring his hair into compliance, but he refused on religious grounds and was issued a disciplinary ticket. (*Id*. ¶ 11.) In accordance with the policies and procedures set forth in the Individual Grooming Policy, on July 17, 20, and 22, Defendant repeated the order and offered Holmes barber services; he was issued three more disciplinary tickets when he disobeyed those directives to alter his hairstyle. (*Id*. ¶¶ 12, 13, 14.) On the last occasion, Defendant informed Holmes that a tactical team would be called to remove his hair if he persisted in defying her orders. (*Id*. ¶ 14.) Following Holmes's continued refusal, the Chief Administrative Officer approved Defendant's request that the tactical team remove Holmes's non-compliant hairstyle. (*Id*. ¶ 15.) On July 28, 2015, the tactical team brought Holmes to the facility barbershop, where the barber removed his hair and beard. (*Id*. ¶ 16.) Holmes saw mental health professionals and self-treated his scalp, which was nicked and "wrinkled," in the wake of the haircut. (*Id*. ¶ 27; Pl. Resp. Def. SOF ¶ 27.) Holmes was transferred to Pontiac Correctional Center after his haircut. (Dkt. 4, pg. 1.)

Holmes describes himself as a known "elder Rasta leader." (Pl. Resp. Def. SOF ¶ 11.) He challenges the IDOC policy Defendant invokes as "old" and "no longer used." (Dkt. 34 ¶ 5.) He disputes that it was necessary to transfer him to another institution from the NRC, or to remove his hair and beard to safely transport him, stating that he knows other inmates, one of whom he names, who were transferred with dreadlocks intact. (Pl. Resp. Def. SOF ¶ 7, pg. 5.) Holmes asserts that he

7

was "NO 'security risk'" because he was a mere parole violator and suggests that Defendant should have "given [him] the option of staying in segregation to [the Prisoner Review Board]." (*Id.* ¶¶ 8, 20; Dkt. 34 ¶ 2.) He insists that correctional officials could have searched his hair and beard by running their fingers through the locks, just as they could with loose and flowing hair, as evidenced by his photograph on IDOC's website, which, according to Holmes, IDOC took about six weeks before they cut his dreadlocks.[2] (Pl. Resp. Def. SOF ¶¶ 5, 9, 20.) In the alternative, Holmes states that they could have used another method of searching his dreadlocked hair, such as a metal detector. (*Id.* ¶ 11.) Holmes seeks remuneration of "$10K/$10,000.00 in U.S. dollars." (Dkt. 6, pg. 5.)

The Court screened Holmes's complaint and allowed him to proceed only on a claim that Defendant's conduct may have violated his right to freely exercise his religion.[3] (Dkt. 5.) Defendant has moved for summary judgment in her favor and against Holmes on that claim. (Dkt. 25.)

---

[2] Holmes's current IDOC photograph is below; the dreadlocks on his head appear shorter than describes them.



K84657 - HOLMES, JACOB

[3] Due to his transfer to Pontiac and his request for only monetary damages, Holmes was not permitted to proceed with any claim under the Protection of Religious Exercise in Land Use and by Institutionalized Persons Act, 42 U.S.C. § 2000cc et seq. (Dkt. 5, pg. 4.) Holmes suggested on the eve of summary judgment that officials at Pontiac have attempted to get him to cut his regrown hair. (Dkt. 24.) Any claims based on that conduct—which implicate different Defendants at another prison—are not before the Court.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Jajeh v. County of Cook*, 678 F.3d 560, 566 (7th Cir. 2012). When addressing a motion for summary judgment, this Court construes the facts and makes all reasonable inferences in favor of the non-movant. *Jajeh*, 678 F.3d at 566. The Court's role is "to determine whether there is a genuine issue for trial," *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (citations and quotations marks omitted), without "weigh[ing] evidence, mak[ing] credibility determinations, resolv[ing] factual disputes and swearing contests, or decid[ing] which inferences to draw from the facts." *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014).

After a properly supported motion for summary judgment is made, the party opposing summary judgment "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby*, 477 U.S. 242, 256 (1986). Although a Court considers facts and reasonable inferences in the light most favorable to the non-moving party, *Zuppardi v. Wal-Mart Stores, Inc.*, 770 F.3d 644, 649 (7th Cir. 2014), the non-movant must show more than disputed facts to defeat summary judgment—disputed facts must be both genuine and material. *Scott v. Harris*, 550 U.S. 372, 380 (2007). To survive summary judgment, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and instead "must establish some genuine issue for trial such that a reasonable jury could return a verdict in her favor." *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 772–73 (7th Cir. 2012). Moreover, evidence submitted in opposition to summary judgment must be admissible at trial under the Federal Rules of Evidence, although attested

testimony, such as that found in depositions or affidavits, also may be considered. *Scott v. Edinburg*, 346 F.3d 752, 759-60 & n.7 (7th Cir. 2003); Fed. R. Civ. P. 56(c).

Invoking this standard, Defendant argues that she is entitled to summary judgment because Holmes has not demonstrated a cognizable violation of his First Amendment Rights. Alternatively, she argues that Holmes did not suffer an injury and thus cannot recover compensatory damages, and that, in any event, she is entitled to qualified immunity. For the following reasons, Defendant is entitled to judgment on the merits, and the Court need not reach Defendant's other arguments.

**I.** *First Amendment*

The Free Exercise Clause of the First Amendment prohibits the government from making decisions, rules or laws that selectively burden the free exercise of religion. *Listecki v. Official Comm. of Unsecured Creditors,* 780 F.3d 731, 743 (7th Cir. 2015) (stating that free exercise clause prohibits states from selectively imposing burdens "only on conduct motivated by religious belief") (quoting *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,* 508 U.S. 520, 543 (1993)). A burden may take the form of pressure to change pressure or beliefs and must be beyond "mere inconvenience to rise to the level of a constitutional injury; it must place 'significant pressure' on [the plaintiff] to 'forego religious precepts.'" *Vision Church v. Vill. of Long Grove,* 468 F.3d 975, 999 (7th Cir. 2006). Prisoners retain rights to the free exercise of their religion within prison walls, although prison life will necessarily place some limitations on that exercise. *See Vinning-El v. Evans*, 657 F.3d 591, 592-93 (7th Cir. 2011).[4] Applying the standards set forth in *O'Lone v. Shabazz,* 482 U.S. 342, 348-50 (1987) and *Turner v. Safley*, 482 U.S. 78, 89-91 (1987) for analyzing whether governmental rules or

---

[4] Although Holmes testified that he is "not religious," (Def. SOF ¶ 23), the Court assumes, as does Defendant, that Holmes's hairstyle choice stems from his sincerely-held religious views related to his Rastafarianism. (Dkt. 27, pg. 5.)

10

regulations constitute impermissible burdens upon religious exercise, courts have long upheld challenges to rules of general and neutral applicability that have the unintentional effect of burdening religious practice. *See Grayson v. Schuler*, 666 F.3d 450, 452-53 (7th Cir. 2012) (citing cases).

The Seventh Circuit, however, has questioned whether "prison authorities [are required] to 'accommodate' an inmate's religious preferences if consistent with security and other legitimate penological concerns" at all. *See id.* at 452-53 (discussing tension between, on one side, *Employment Division v. Smith*, 494 U.S. 872 (1990), which held that regulations of general applicability, not intended to discriminate against particular religion or religious sect, did not violate free exercise clause, and on the other, *O'Lone,* 482 U.S. 342, and *Turner*, 482 U.S. 78, which suggested that prison officials may need to accommodate prisoners' religious exercise if consistent with institutional safety and security). The Seventh Circuit theorized that, because "it's hard to believe that prisoners have more rights than nonprisoners," should the occasion arise, the Supreme Court likely would overrule *O'Lone*, in favor of *Smith*'s holding that accommodation would not be required. *Grayson*, 666 F.3d at 453 (citing *Cutter v. Wilkinson*, 544 U.S. 709, 714-17 (2005); *O'Lone*, 482 U.S. at 348-50); *but see Holt v. Hobbs*, 135 S. Ct. 853, 862 (2015) (citing *O'Lone* and *Turner* as providing factors relevant to cases regarding First Amendment rights of prisoners).[5]

---

[5] Holmes relies upon *Holt* to support his claims, *see* Dkt. 34, pg. 2, but *Holt* involved a RLUIPA claim in which the prisoner wanted to grow a ½-inch beard; the present case involves only a First Amendment claim. Similarly, in *City of Boerne v. Flores*, 521 U.S. 507 (1997), which Holmes cites, the Court held that Congress had exceeded its powers under section 5 of the Fourteenth Amendment in enacting the Religious Freedom Restoration Act of 1993 (RFRA). The present case does not involve a claim under RFRA, RLUIPA's predecessor in this context. Holmes also sprinkled case cites throughout his response to Defendant's Statement of Facts, but little context is provided for the citations, which generally do not support Holmes's contention that Defendant violated his rights. In denying that he used "binding agents" to dreadlock his hair, (Pl. Resp. Def. SOF ¶ 18), for example, Holmes cited *Fillmore v. Page*, 358 F.3d 496, 506 (7th Cir. 2004), in which the court analyzed a failure to intervene claim and claims levied against unknown officers, neither of which appears relevant to Holmes's claims in this case or his denial of the facts at issue. The cited cases that are most relevant to Holmes's claim at this procedural stage are discussed below.

Given that there is no dispute that Defendant's actions here were grounded in security concerns, any tension between the *O'Lone* and *Smith* analyses likely would not affect the result in this case. *See Lewis v. Sternes*, 712 F.3d 1083, 1085 (7th Cir. 2013). Prison security has, after all, long been held to justify the institutional regulation of hairstyles, despite any incidental impact upon an inmate's religious exercise. *See id*. ("The case law recognizes the need for and validity of rules regulating the hairstyles of prisoners in the interest of security.") (collecting cases).

As *O'Lone* remains good law, Defendant has invoked the four-factor test for analyzing a neutral prison regulation alleged to have impacted an inmate's religious practice, which was set forth in *Turner*, 482 U.S. at 89-90: (1) whether there is a valid rational connection between the regulation at issue and the legitimate governmental interest offered to justify it; (2) whether there are alternative means for exercising the asserted right; (3) the impact any proposed accommodations would have upon guards and other inmates; and (4) the absence of ready alternatives. The Court accordingly examines the application of these factors in the present case.

    *i.*    *Connection Between Regulation and Proposed Governmental Interest*

The challenged grooming policy (which Plaintiff does not contend impermissibly targets any particular religion or religious sect) requires inmate hairstyles to be "neat and clean" and free of any "security risk." (Def. SOF ¶ 8.) Defendant has presented evidence that it is necessary to ensure the safety and security of prisoners during transportation outside the NRC. Defendant determined that, in violation of the grooming policy, Holmes's long, dreadlocked, hair and beard could not be thoroughly searched by correctional officials (*i.e.*, that it "impede[d] or prevent[ed] . . . a thorough search of the hair for contraband," might prevent the detection of contraband, or posed a risk of injury to the staff

members searching the hair.) (*Id*. ¶ 9) She thus concluded that his dreadlocked hair and beard posed a security risk during transport.

Courts have repeatedly held that regulations requiring searchable hairstyles generally are valid and rationally connected to the security of the institution and the health and safety both of the inmates and correctional officials and any members of the public with whom prisoners might come into contact, despite incidental impact upon prisoners' religious practice. *Grayson*, 666 F.3d 450 ("The case law indicates that a ban on long hair, including dreadlocks, even when motivated by sincere religious belief, would pass constitutional muster.").

Holmes nevertheless challenges Defendant's need to search his hair. According to Holmes, IDOC's proffered reason for requiring him to cut his hair is suspect because he is aware of other inmates who had visitors, went to court, were released, or were transferred from the NRC to other institutions while their hair was in dreadlocks. Even had Holmes properly submitted admissible evidence identifying these other inmates and providing relevant details, evidence about other dreadlocked inmates' release or visitation is not relevant to whether Holmes's hair posed a security risk *during transportation to another facility*. *See Lewis*, 712 F.3d at 1083 ("Although the plaintiff has identified a fellow prisoner who was allowed to wear dreadlocks similar to his, which he argues shows that the prison has no need to regulate dreadlocks, that prisoner was just receiving prisoners and was not going to court."). Holmes names one inmate he says was permitted to transfer from the NRC with dreadlocks on his head, but he does describe the timing of those transfers or suggest, much less show, that the other inmate's dreadlocks were like his in terms of length, thickness, depth, and number. His unsupported assertion does not create a material question of fact. *See id*. ("The plaintiff has presented no evidence that he was treated differently from any other inmate similarly situated.").

13

Moreover, it is unsurprising that other inmates have dreadlocks, as IDOC did not have a blanket ban on dreadlocks. Instead, its grooming policy gives the correctional officials discretion based upon individualized circumstances. *Id*. at 1087 ("[The "broad discretion" allowed to prisons "in matters of security"] extends to a determination that a particular inmate's dreadlocks on a particular occasion (such as a visit to federal court) are too thick or dense to be readily searchable."). Under this policy, Defendant exercised her discretion to determine that Holmes's dreadlocks were not readily searchable for transport, and Holmes's disagreement does not undermine this determination. *See id*.

Holmes also argues that his status as a parole violator, guilty only of what he deems to be a minor rule infraction, indicated that he posed "NO 'security risk'" and should not have been subjected to the grooming policy. (Dkt. 34 ¶ 2; *see also* Dkt. 35 ¶ 20.) But he cites, and the Court has found, no support for an argument that a parole violator in the custody of the Illinois Department of Corrections presents fewer safety and security concerns than other prisoners with dreadlocks, such that they should be subjected to different rules for safety and security during transport. *See Lewis*, 712 F.3d at 1087 (observing that plaintiff presented "no evidence that a member of [a particular religious] sect is less likely to conceal contraband in his dreadlocks than a prisoner who wears dreadlocks for secular [] reasons"). Accordingly, the Court finds that Defendant's asserted interest in safety and security is valid and rationally connected to the grooming policy.

    *ii.*    *Existence of Alternative Means to Exercise Religious Rights*

The record shows that Holmes had available to him alternative means to exercise his religious rights. Dreadlocks were, after all, only one aspect of Rastafarianism to him. He testified that, while dreadlocks are a form of his "expression," Rastafarianism is "a way of life." (Def. SOF ¶¶ 22, 23, 24,

14

26.) He has studied multiple religious texts and "can quote out of the Bible, Koran, or Torah." (*Id*. ¶¶ 24, 25.) He gathers with other Rastafarians in a group called a "Cypher" to "interpret Old Testament" and the other practitioners considered Plaintiff an elder. (*Id*. ¶ 25.) *See O'Lone*, 482 U.S. at 352 (finding no violation where "respondents are not deprived of all forms of religious exercise, but instead freely observe a number of their religious obligations").

         *iii.*       *Impact of Proposed Accommodations on Guards and Other Inmates*

Holmes proposes that, even if his hair could have been deemed to pose a security risk during transportation, Defendant could have accommodated his chosen hairstyle by avoiding the transfer—*i.e.*, he could simply have been left indefinitely at the NRC, in segregation due to his insubordination, rather than being transported to his parent institution. (Dkt. 35 ¶¶ 10, 11; Dkt. 34 ¶ 2.) This argument would require that all prisoners with religious grooming practices that might result in unsafe conditions for guards or other inmates stay at the NRC, without the possibility of transfer to another IDOC facility. Prisoners, however, are not privileged to dictate their housing or prevent their transfer to other institutions. *See, e.g., Meachum v. Fano*, 427 U.S. 215, 228 (1976) (holding that prisoners have no liberty interest originating in Constitution in remaining in particular penitentiary); *DeTomaso v. McGinnis,* 970 F.2d 211, 212 (7th Cir. 1992) ("States may move their charges to any prison in the system.").

         *iv.*       *Absence of Ready Alternatives*

Finally, Holmes contends that correctional officials could simply have manually searched his dreadlocks prior to transfer to assuage any security concerns. He claims they could have searched his dreadlocks in exactly the same manner as a search of inmates with loose and un-dreadlocked hair. Holmes' argument seems to be that guards could have run their fingers *between* the dreadlocked

strands of his hair and beard, but courts have explained that the chief concern is that contraband might be concealed *within* an individual lock. *See Grayson*, 666 F.3d at 452 ("One can see why prison officials might fear that a shank or other contraband could be concealed in an inmate's dreadlocks"); *Williams v. Snyder*, 367 Fed. Appx. 679, 682 (7th Cir. 2010) ("Dreadlocks conceal drugs, sharp plastic objects, needles, makeshift blades constructed from pens, even kitchen knives" and "black threads" used "to create makeshift handcuff-saws by coating the thread with toothpaste and letting it harden and dry"); *Shepherd v. Fisher*, No. 08-CV-9297 (RA), 2017 WL 666213 (S.D.N.Y. Feb. 16, 2017) (noting that plaintiff prisoner challenged search of hair in prison that "result[ed] in the discovery of several ounces of methamphetamine secreted in his dreadlocks"). This is consistent with Defendant's explanation that an inmate a hairstyle was deemed a security risk if it might make detection of contraband difficult or if staff members searching the hair might be injured by any concealed contraband. (Def. SOF ¶ 9.) Holmes' suggestion of a metal detector does not alleviate this security concern, as it will not reveal drugs, plastic, or threads. *Williams*, 367 F. App'x at 68-82. Holmes thus points to no ready alternatives to cutting his dreadlocks.

For all of these reasons, the IDOC's reliance on prison security is a compelling government interest, and the grooming regulation is both reasonably related to that interest and the least restrictive means available to advance that interest. Accordingly, Defendant is entitled to summary judgment.

## II.  Qualified Immunity

Defendant finally argues that, even if Holmes had shown a violation of his constitutional rights, she is protected by the doctrine of qualified immunity. In Section 1983 cases, government officials performing discretionary functions generally are immune from liability as long as their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable

person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *see also Grayson*, 666 F.3d at 455 (explaining that qualified immunity "protects public employees who make reasonable errors in applying even clearly established law.") (quoting *Vinning-El v. Evans*, 657 F.3d 591, 594 (7th Cir. 2011) (quotation marks omitted)). When evaluating a qualified immunity defense as a basis for summary judgment, the Court must examine two prongs (in either order): (1) whether the facts, taken in the light most favorable to Plaintiff, show that the defendant's conduct violated a constitutional right and (2) whether the constitutional right alleged to have been violated was "clearly established." *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *Pearson v. Callahan*, 555 U.S. 223, 236 (2009) (overruling *Katz* to the extent that *Katz* required the prongs to be analyzed in order); *Gruenberg v. Gempeler*, 697 F.3d 573, 578 (7th Cir. 2012).

As explained above, the facially-neutral prison grooming policy passes constitutional muster in light of the compelling government interest in prison security. Even had Defendant's actions violated Holmes's constitutional rights, however, Holmes still cannot show that the constitutional right in question was "clearly established." For a right to be "clearly established" for qualified immunity purposes, "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011); *Gruenberg*, 697 F.3d at 578 ("Qualified immunity shields government officials from liability under Section 1983 'for actions taken while performing discretionary functions, unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known.'") (citation omitted).

The Court is unaware of any cases holding that the application of the standard prison grooming policy violates a Rastafarian's constitutional rights under the First Amendment, much less that any

particular application of the policy (absent an improper purpose not present here) does so. *See Lewis*, 712 F.3d at 1085 (collecting cases). On the contrary, cases in this circuit have theorized, after analyzing First Amendment case law, that even neutral grooming regulations with an outright ban on long hair are constitutional, despite any attendant impact on some inmates' religious beliefs. *See id.*; *Grayson*, 666 F.3d at 452-53 (citing cases); *but see Grayson*, 666 F.3d at 455 (holding that if defendant were applying rule that only Rastafarian inmates could wear dreadlocks to justify shearing dreadlocks of inmate who followed African Hebrew Israelite of Jerusalem, such rule "could not reasonably thought constitutional").

Here, Defendant applied the standard facially-neutral grooming policy. No clearly established law suggested that applying that policy as it was applied to Holmes would violate his clearly established rights. Defendant's belief that Holmes's hair posed a security risk during transportation from the NRC to another facility (which belief is not undermined by any fact in this record) therefore cannot be deemed unreasonable under the circumstances. *See id.* at 455 (explaining that "defendant is entitled to immunity if he committed a reasonable error in failing to apply clearly established law— that is, if he reasonably thought the plaintiff insincere in his religious belief, or a security threat"). The Court therefore finds that the undisputed facts in this case fail to show that Defendant's conduct violated Holmes's constitutional rights or that any alleged constitutional right was then "clearly established." *Saucier*, 533 U.S. at 201.

## CONCLUSION

For the above reasons, the Court grants Defendant's motion for summary judgment [25]. Final judgment shall enter.[6]

Date: February 3, 2015

AMY J. ST. EVE
United States District Court Judge

---

[6] If Holmes wishes to appeal, he must file a notice of appeal with this Court within thirty days of the entry of judgment. *See* Fed. R. App. P. 4(a)(1). If Holmes appeals, he will be liable for the $505.00 appellate filing fee regardless of the appeal's outcome. *See Evans v. Ill. Dep't of Corr.*, 150 F.3d 810, 812 (7th Cir. 1998). If the appeal is found to be non-meritorious, he could be assessed a "strike" under 28 U.S.C. § 1915(g). If a prisoner accumulates three "strikes" because three federal cases or appeals have been dismissed as frivolous or malicious, or for failure to state a claim, the prisoner may not file suit in federal court without pre-paying the filing fee unless he is in imminent danger of serious physical injury. *Ibid.* If Holmes seeks leave to proceed *in forma pauperis* on appeal, he must file a motion for leave to proceed *in forma pauperis* in this Court. *See* Fed. R. App. P. 24(a)(1).

Holmes can file an appeal without bringing a motion to reconsider this Court's ruling. But if he wishes this Court to reconsider its judgment, he may file a motion under Federal Rules of Civil Procedure 59(e) or 60(b). Any Rule 59(e) motion must be filed within 28 days of the entry of this judgment. Fed. R. Civ. P. 59(e). Any Rule 60(b) motion must be filed within a reasonable time and, if seeking relief under Rule 60(b)(1), (2), or (3), must be filed no more than one year after entry of the judgment or order. Fed. R. Civ. P. 60(c)(1). The time to file a Rule 59(e) or Rule 60(b) motion cannot be extended. Fed. R. Civ. P. 6(b)(2). A Rule 59(e) or Rule 60(b) motion suspends the deadline for filing an appeal until the ruling on the motion, but only if the motion is filed within 28 days of the entry of judgment. Fed. R. App. P. 4(a)(4)(A)(iv) and (vi).